THE OCEAN CITY ASSOCIATION and FRANK B. SCHNEIDER

*v.*

HARRY HEADLEY.

[Filed September 26th, 1901.]

1. Where the evidence shows that portions of a tract of land have been sold in town lots under a general scheme of improvement imposing restrictions as to the location of buildings at certain named distances from the front and side lines of the lots, and the original grantor permits numerous open, public and continuous violations of these restrictions to be perpetrated by various lotowners, over a period of more than twelve years, without bringing suit to correct or prevent them, equity will not, at the instance of the original grantor, specifically enforce those restrictions.

2. A remote grantee of the original owner, whose lot is within the plan, who stands by and sees the owner of the next lot locate and partially build his house in violation of the restrictions, cannot maintain against his neighbor a bill in equity for specific enforcement of the restrictions, requiring his neighbor to take down his house.

3. The bill of complaint of such a grantee of the original owner will not be entertained when it is shown that he has himself, on his own lot, part of the tract within the general plan, violated the very restriction which, by his bill, he seeks to enforce against his neighbor's lot, also part of that tract.

On bill, answer and proofs.

The complainants in this bill are the Ocean City Association, a corporation of this state, and Frank B. Schneider. The Ocean City Association was the owner of a considerable tract of beach land, now Ocean City, which it conveyed to various persons, in accordance with a plan of lots on file in Cape May county clerk's office. The deeds of conveyance of its various lots were made subject to certain conditions and restrictions, expressed in the deeds and set out in the bill of complaint, among which were the following:

"That no building of any description whatever shall at any time be erected within ten feet of the front line of the said avenue, nor within

Ocean City Asso. *v.* Headley.

four feet of the side line of said lots, excepting where a party may own two or more continuous lots, then a building may be erected on any part of the lot or lots the owner thereof may desire, without regard to the intervening line or lines, provided the same is not built within four feet of the outside lines of said lot, nor within ten feet of the front line thereof."

The other restrictions contained in the association's deeds are set forth at length in the bill of complaint. They indicate a general plan of improvement and development of the tract affected by them, and conclude with these words:

"And also under and subject to the express conditions, restrictions and regulations which may hereafter from time to time be made by the said party of the first part hereto, for carrying out and enforcing the above conditions and restrictions and the rules and regulations necessary to insure the original intention and purpose of the party of the first part in securing the whole island as a Christian seaside resort."

The association, on November 6th, 1880, conveyed to one Thomas Shaw lot No. 443, in section A, on the plan of lots of the association. The deed contained the restrictions inserted by the association in all its deeds, among others those above quoted. By intermediate conveyances lot No. 443 came to be owned by the complainant Frank B. Schneider, by deed dated November 18th, 1895.

On January 24th, 1881, the association conveyed to William B. Wood the adjoining lot, No. 441, in section A, on the plan of lots. The deed to Wood contained the same conditions and restrictions as those contained in the deed to Shaw. Afterwards, by intermediate conveyances, lot No. 441 was, on the 15th day of May, 1896, conveyed to Harry Headley, the defendant in this cause. Lots Nos. 441 and 443, in section A, adjoin each other, and are both situated on the northwesterly side of Asbury avenue, between Eighth and Ninth streets; each is thirty feet front on Asbury avenue by one hundred feet deep.

The complainant Schneider has erected on lot No. 443 a dwelling-house, which, he alleges in his bill of complaint, was not located within four feet of either of the side lines of the adjoining lot, which dwelling he occupies and uses as his residence. The complainants allege and base their right to relief in this cause upon their allegation that the Ocean City Association

formerly owned all the land in the vicinity of the lots in question, and laid it out and developed it as a seaside resort, known ·as Ocean City, and made all its sales of lots under the same restrictions set forth in its bill, for the object and purpose of securing to purchasers of lots open spaces between this building, in order to give it abundant light and air; that it has made all its sales of lots; that the erection, completion and maintenance of Headley's building against the side lines of Schneider's lot will be a violation of the conditions and restrictions above named, and will be very injurious to Schneider by diminishing the value of his property, and depriving him of the conveniences he is entitled to have under the restrictions set forth in both his own and Headley's antecedent conveyances, and will greatly prejudice the association in accomplishing the purposes for which the restrictions were inserted in the deeds. The prayer of the bill is that Headley may be enjoined from the erection of his building within four feet of the side line of Schneider's lot, according to the restrictions above quoted.

An order was allowed directing the showing of cause why a preliminary injunction should not be issued. On the coming in of the order, an answer was filed by the defendant, Headley, with accompanying affidavits, and thereupon the order to show cause for a preliminary injunction was abandoned.

By his answer the defendant, Headley, declares that he has no knowledge of the chain of title whereby Schneider received conveyance of his lot, No. 443. He admits that the restrictions set forth in the bill are incorporated in the complainant Schneider's deed; that he (Headley) is the owner of lot No. 441; that his title thereto is derived through the Ocean City Association; that its deed for that lot contains a restriction as set forth in the bill, but he insists that the covenant of the association with Wood (grantee of lot 441, now owned by defendant) was entered into after its sale to Shaw of lot 443 (now owned by Schneider), and that there was no covenant whatever between Wood and Shaw. He further answers that the complainant Schneider, in erecting his own building, has so located it on lot 443 that the line of it is but three feet ten and one-half inches from his southwest property line; that the front of complainant's build-

Ocean City Asso. *v.* Headley.

ing is composed of two bulk windows, built solidily from the ground to the second floor, and they are located within eight feet four inches of the front street line; that at the top of the bulk windows is a balcony, or veranda, which forms the roof thereof, and extends outwardly to within five feet one inch of the front property line. The defendant further alleges that the complainant Schneider's building, on the northeasterly side, adjoining the defendant's lots, has two porches, the first of which is nine feet two inches long, built into the complainant Schneider's house, and forming part thereof, and covered with a tin roof, which projects over the defendant's property line for a distance of six and three-quarters inches. The complainant's other porch is five and one-half feet long, with a tin roof, which actually extends over the defendant's line seven and a quarter inches on the side adjoining defendant's property; that the porch last named is enclosed with tight siding, and is within two or three inches of the defendant's property line; that this last structure is located directly opposite the place where defendant had originally planned to place a window in his building, but the porch of the complainant being tightly closed, there was no means of securing light for a window, and that the rain running down from the said complainant's porch would pour into the defendant's window, and for these reasons the defendant was compelled to change the plan of his house; that the remaining portion of the northwesterly side of the complainant Schneider's house is within three feet and eleven inches of the property line between the complainant's and the defendant's lots.

The defendant further asserts in his answer that, after the trenches for the foundation of his building had been dug, but before the foundation had been laid, the complainant Schneider declared to one Baker his purpose to allow the defendant to build his wall part of the way up, and that he was then going to apply for an injunction and compel the defendant to tear down his wall. The defendant denies that his building adjoins the side line of the complainant's lot, and asserts that it is eleven inches distant from the adjoining property line of the said Schneider. The defendant's answer was filed on July 6th, and he denies the assertion in the bill that he had commenced the

erection of his building within a few days before the filing of the bill, on the 2d of July. On the contrary, he alleges that the trenches for the foundation of the southwesterly side of his building were dug about the 1st day of June; that the work on the foundation was commenced on the 2d day of June, and continued up until the time of the serving of the restraining order in this suit. The defendant's building is a brick structure, fifty-eight feet in depth, and has been built to a height of fifteen feet; the second story joists are already on. He alleges that contracts have been made for millwork to carry the plans into effect, also for iron work, beams and trusses, and an iron front for the building, which will be entirely useless if the width of the building be changed. The defendant further sets up in his defence that in a conversation with Ezra B. Lake, secretary and general manager of the Ocean City Association, the latter stated to the defendant that the Ocean City Association would take no steps to compel the defendant to remove his wall; that, relying on that statement, the defendant entered into the contracts above named.

The defendant further alleges that, within a few years past, Asbury avenue, which was formerly used for residential purposes, has come to be used almost exclusively for business purposes; that nearly every house on the northwesterly side of Asbury avenue, between Sixth and Ninth streets, where the defendant's house is situated, is located over the restrictive lines mentioned in the above covenant, either on the front or on the side; that many buildings on the southeasterly side of the street have also been located in violation of the said restrictive lines, and that there has not been, within the past four years, one building erected on Asbury avenue, between Sixth and Ninth streets, for business purposes which does not violate the restrictions, either as to side lines or front property line; that the restrictive lines as to buildings have been violated almost from the time the first house in Ocean City was built. The defendant instances the Ocean City House, the Methodist Episcopal Church, at the corner of Central avenue and Eighth street, and the Protestant Episcopal Church, at the corner of Central avenue and Eleventh street, as being built over the restrictive lines. The defendant sets forth further instances of breaches by the Ocean City Association itself

of the restrictions and reservations of lots by the Ocean City
Association which were parts of its general plan, and particularly
that the association sought to erect buildings on the lands re-
served for a park.   The defendant refers to a suit in restraint
of the association's effort to appropriate the park lands in breach
of its covenant, reported under the name of *Lennig* v. *Ocean
City Association, 14 Stew. Eq. 606.*   He further alleges that
the association contracted with one Matthews that if he would
secure to the association the right to dispose of property which,
by its general plan, it had agreed to reserve as a park, the asso-
ciation would convey one or more lots to him, and the defendant
says that, with the said association's assent, Matthews did, in
violation of the restrictions and reservations, locate a dwelling-
house on the reserved park ground.   The defendant further al-
leges that, from 1883 until the time of the filing of the answer,
the building restrictions above recited have been violated, with
full knowledge of the Ocean City Association, and with its entire
acquiescence, until the beginning of this suit.

The defendant, in his answer, insists that the complainants are
improperly joined, and that the facts set forth in the bill show
no sufficient ground for relief, and he prays the same benefit as
he would have been entitled to had he demurred to the bill of
complaint.

Issue was joined and the cause has come to a hearing.

*Mr. David J. Pancoast,* for the complainants.

*Mr. George A. Bourgeois, Jr.,* for the defendant.

GREY, V. C.

It may be stated in the opening of the consideration of this
cause, that the defendant, Headley, appears, by his answer and by
all the evidence, to have so located his building on lot No. 441,
section A, of the Ocean City Association plan, that it is within
four feet of the side lines of that lot.   It is clearly shown that
if the restrictions created by the deed for lot No. 441, from
that association to William B. Wood (the defendant's remote

grantor), are still imposed on that lot, the location of the defendant's building is in violation of them.

The disputed points in the cause therefore depend upon the efficiency of the defence set up, that the association has so acquiesced in notorious breaches of the restrictions in question, that they have been abandoned and that it is not now in a position to ask relief in equity enjoining specific performance of them, but must be left to its remedies (if it has any) in the courts of law; and as to the complainant Schneider, that he also is in no position to ask this court to enforce the restrictions against the defendant's lot, for the various reasons hereinafter discussed.

The bill of complaint in this cause recites from the deeds made by the Ocean City Association, in the inception of its enterprise, special covenants, restrictions and conditions affecting the use of the lands conveyed by the association. These all indicate a general plan for the development and improvement of the land which the complainant, the Ocean City Association, was offering for sale at Ocean City. The association, in its bill of complaint, alleges that it sold both the lots in question in this cause; lot No. 443, to Thomas Shaw, a remote grantor of the complainant Schneider, and the other lot, No. 441, to William B. Wood, a remote grantor of the defendant, Headley, under this plan. The recited restrictions and conditions exhibit a general building scheme intended to be made more attractive by the restrictions imposed upon the use of the lots, and also a purpose to make the settlement a place where those religiously inclined might find a harmonious environment. The concluding declaration following all the conditions and restrictions in the deed clearly expresses the idea that all the lots were to be sold with this general object in view, for it is there recited that the original intended purpose of the party of the first part (the association) was the "securing the whole island as a Christian seaside resort."

The complainants allege that the defendant is grantee of one who purchased from the association by a deed which imposed all the recited restrictions; that in erecting his proposed building he has broken that restriction which required him not to erect any building within four feet of the side lines of his lot.

It should be noted that it is neither alleged nor proven that the defendant has himself entered into any covenant with either of the complainants. The person who, by accepting a deed covenanted with respect to lot No. 441, owned by defendant, was William B. Wood, to whom the association conveyed, and in whose deed the restrictions are contained. The defendant, Headley, is a subsequent grantee through several intermediate holders of the title. His deed was made to him not by the association, but by one Robert Corson. It does not contain the restrictions. The recital in Headley's deed is, that the lands are conveyed to him "under and subject, however, to the reservations and restrictions of the Ocean City Association."

These words are indefinite and uncertain. They do not specify what reservations and restrictions of the association are referred to, nor do they point out any deed, record or other place where they may be found. If these deficiencies be supplied by conjecture (for no proof has been offered to show to what restrictions the words refer), and it be assumed that they declare that the conveyance of lot No. 441 to Headley was subject to the reservations and restrictions of the Ocean City Association in and by its deed conveying the said lot to William B. Wood, dated January 24th, 1881, they are still inoperative to create any personal undertaking on Headley's part to observe the restrictions set forth in the association's deed to Wood. The utmost effect which can be claimed for the recital in Headley's deed is, that in 1881, the restrictions had been imposed upon lot No. 441 by the deed which the association then made to William B. Wood.

No privity of contract between the association and Headley was created by the recital in Corson's deed to Headley. The reference to restrictions cannot be held to be a new covenant entered into by Headley. It is a mere warning that in buying lot No. 441, he took it under and subject to restrictions in the use of that lot which the association had theretofore imposed. In short the mention of the restrictions in Corson's deed to Headley is not a contract regarding the restrictions, and has no original binding force, expressly or impliedly, upon Headley, as his contract. The reference to the restrictions, if effectual at all, is in the same class as the familiar phrase in deeds, where

property is recited to be conveyed, "subject to a mortgage of ———— made by ———— to —.———." Such clauses impose no contractual obligation on the grantee to pay the mortgage; they simply give notice of a previously existing charge on the lands. If the grantee in a deed containing such a recital releases his interest in the lands, he has no personal liability for the debt. *Tichenor* v. *Dodd, 3 Gr. Ch. 454; approved in Crowell* v. *St. Barnabus, 12 C. E. Gr. 655 (Court of Appeals).*

. This exposition of the effect of the recital in the deed from Carson to Headley is of importance because the counsel for the complainants contends that the clause referred to in that deed is a personal undertaking by Headley (as of the date of the receipt of his deed in May, 1896) with the association, and that no instances of the latter's acquiescence in the abandonment of the restrictions are of any avail in behalf of Headley, unless they happened after the date of the delivery of Headley's deed. Whereas, by the true construction of the reference to restrictions in Headley's deed (if that reference is sufficiently definite to have any effect), he was notified that the association had, in 1881, conveyed lot No. 441 to Wood, subject to the restrictions. If, in 1896, when Headley's deed was delivered, the association had abandoned the restrictions, they were no longer binding on lot No. 441. They were in the same position as a mortgage, subject to which a lot had been conveyed. If the mortgage had been paid, the lot would be discharged from its lien. So if the restrictions had been abandoned in 1896, when Headley took his deed for lot No. 441, they cannot be enforced against that lot. Headley's deed cannot be held to have revived and renewed them. The utmost that can be ascribed to the reference to them in Headley's deed is that it recognized their original creation.

But even upon the above-stated theory of the counsel for complainants, that no instances of abandonment of the restrictions by the association can be considered other than those which happened since Headley took his deed, the evidence in this cause shows that violations have continued since the taking of Headley's deed. The proof shows that Mr. Campbell's store, at the corner of Ninth street and Asbury avenue, built since this suit was begun, and the building of Mr. Anderson Bourgeois, on the

opposite side of Ninth street, built in the spring of 1897, were located in violation of the restrictions, both of them after the date of Headley's deed in May, 1896. No proof of substantial objection of any sort is offered, though these are large structures upon the most public and traveled streets of Ocean City.

It being shown that the complainants' contention is an error, and that the mention of the restrictions and reservations of the Ocean City Association in Headley's deed was merely an acknowledgment by him that restrictions upon the use of the land conveyed had been previously imposed by the association in its deed to Wood, in 1881, it follows that any instances of acquiescence in the abandonment of the restrictions by the association, since 1881, are forceful to show that they are not presently obligatory, and to put the association in the attitude of a party who, having notoriously abandoned the enforcement of a covenant to which it was itself a party, now comes into a court of equity and asks that it be enforced against the grantee of one of the other parties to it.

The evidence in the cause of many breaches of the restriction upon the location of buildings at the distance of four feet from the side lines and ten feet from the front line of the lots sold, is substantially undisputed. It shows that from the very inception of the enterprise buildings were openly placed on the lots sold, in manifest and entire disregard of their relations to either side lines or the front lines, and in violation of the restrictions. These incidents happened in so many different cases, and with regard to buildings of such important character, such as the public hall, the trust company's bank building, churches, hotels, city power-house, boarding and dwelling-houses and the like, located in the busiest part of the city, and running over a period of time for some twelve to fifteen years, preceding the making of the deed to Headley, that it is impossible to believe that the association had either intention or expectation of enforcing the covenant requiring buildings to be located at certain distances from the front and side lines of the lots sold. More than fifty out of sixty odd buildings erected in the immediate neighborhood of the defendant's (Headley) lot, have been located in breach of the prohibition regarding the distance from the side lines, and

more than sixty of them in breach of that regarding the front lines. The character of the violations was so public and notorious that it must have been impossible to pass the streets where they were constantly happening without noticing them. The superintendent and manager of the association was a resident of Ocean City during the period when these violations of the restrictions in the association's deed were being committed. He was called as a witness by the complainants to enforce the covenant. His answers on cross-examination, as to the tacit assent of the association to these repeated violations of the restrictions, were unwilling and evasive. He sought to deny knowledge of any of the violations which occurred under his observation, because he said he had not actually measured their extent in feet and inches. His own testimony, however, shows that not only he, but the association itself, had familiar knowledge of these violations, and that they permitted the owners of adjoining side lines to arrange the location of their buildings to suit their own profit and convenience, in open breach of the restrictions. This was notably shown by the testimony of the superintendent himself with regard to the location of the Central Trust Company's building. He was asked:

"*Q.* Did you understand that they [the Central Trust Company] had bought part of Mr. Murdock's lot, or was your understanding that there was an agreement between them and Mr. Murdock that if they would let him build over on their side, he would let them build on his side?

"*A.* I don't know anything about the terms, but that is what I recommended, that he should buy part of Murdock's lot, as he said he had drawings and it would be a very great disadvantage to cut his drawing off and destroy his building; I said, 'Your correct way would be to buy part of Murdock's lot,' and they went on and did the work; I don't know whether they bought it or not."

The Central Trust Company's building, under this arrangement, was located in violation of the restrictions. The location of Mr. Fisher's block, on the corner of Seventh street and Asbury avenue, was another case where a dispute arose between Mr. Fisher and Mr. Werts, an adjoining owner. The superintendent testified that Mr. Werts wrote several letters to him, and the matter got so far as a notice for the association's attorney to

take up the case for him, and that the association would pay
the damages. The superintendent further testifies, "Finally Mr.
Fisher and he made some settlement—I don't know what—so
that we were not asked to go on any further with it." He was
then asked, "*Q.* And the building remained over the line, as I
understand it? *A.* I don't know that; I presume it is; I haven't
measured." The Fisher block is one of those proven to have been
built in violation of the restrictions. At another place in the
testimony of the same witness, after having been examined as
to many specified buildings and whether they had been built
over the line, he replied, "Some of them had been presented to
us, but some of them that he has been talking about were not."

One of the complainants' witnesses, Mr. Stiles, called by them
to prove the value of the restrictions as to building lines, was
obliged to admit, on cross-examination, that he had himself
erected a building in breach of them. The complainant Schneider
was proven to be in the same category, as will appear in the
further consideration of his relation to this case.

The earliest violation shown was in the first or second year
after the inception of the enterprise. More than one hundred
have since occurred, and they are still going on, the last one
proven (the location of Mr. Campell's store, at the corner of
Ninth street and Asbury avenue) having actually happened since
the beginning of this suit. In no case of all these violations,
saving the present suit, was any step taken by the association to
enforce the restrictions, other than mere empty notice and futile
talk. In 1895, after the violations had continued for at least
some twelve or thirteen years, the superintendent testifies:

"Our Association came to the conclusion that it was no more their busi-
ness to maintain this restriction than anybody else's, but as some people
were complaining of the expense of having to fight it single hand, we then
agreed to give public notice that we would pay the expenses of anybody
that was aggrieved in the violation of any restriction as found in the deed
to the Ocean City Association, and that is what brings this suit to us."

Here is plain proof that the association knew of these viola-
tions; that it had not undertaken, in any efficient way, to correct
them, and that it was seeking to throw all the responsibility and

vexation of legal proceedings, except actual cash expended, upon purchasers of its lots, although it alleges that the breaches of the restrictions are of great injury to it in the sale of its remaining lots. Such a notice, published under such circumstances, goes far to show the substantial previous acquiescence of the association in the violation of the restrictions.

The defendant bought and paid for his lot, with the above condition of affairs as to the observation of the restrictions in view. The violations were numerous, open, long continued and destructive of the object obviously intended to be secured by them—*i. e.,* free access of light and air. The violations have gone on and are still proceeding since this suit was begun, as the evidence shows. Notwithstanding the great number of proven violations during the fifteen years, no other suit to enforce these building restrictions has been commenced. The evidence shows a substantial abandonment of them by the association, and certainly places it in such a position to Mr. Headley that it would be highly inequitable to permit it specifically to enforce them, when for years it has assented to breaches of them by all his neighbors, thus depriving his lot of the advantages which their enforcement would have given it.

The principle involved has been lucidly expounded by Lord Eldon, in the case of *Roper* v. *Williams, 1 Turn. & R. 18.* A bill was there filed praying an injunction restraining the erection of a building, because it was alleged to be in breach of a plan of building which the owner of the land had imposed for the benefit of all the grantees. The lord-chancellor declared: "Having long lived in Gower street, I have often been in the habit of illustrating my view of such cases by references to the stipulations contained in the Duke of Belford leases. In the lease of every house on the east side of that street is contained a covenant that there shall be no erection behind them exceeding a certain height. The landlord in such a case is stipulating, not only for his own benefit, but for the benefit of all the tenants in that neighborhood. If, therefore, the landlord, in some particular instances, lets loose some of his tenants, he cannot come into equity to restrain others from infringing the covenant to whom he has not given such a license. He may have a good case

for damages at law; but if he thinks it right to take away the benefit of his general plan from some of his tenants, he cannot, with any justice, come into equity for an injunction against those tenants. It is not a question of mere acquiescence; but in every instance in which the grantor suffers grantees to deviate from a general plan intended for the benefit of all, he deprives others of the right which he had given them to have the general plan enforced for the benefit of all. In such cases I have always understood this court will leave the parties to their remedy at law. There is another view in which this case may be considered; every relaxation which the plaintiff has permitted in allowing houses to be built in violation of the covenant amounts, *pro tanto,* to a dispensation of the obligation intended to be contracted by it. Very little, in cases of this nature, is sufficient to show acquiescence, and courts of equity will not interfere, unless the most active diligence has been exerted throughout the whole proceeding. It is not sufficient to have given notice of the covenant in 1818. In every case of this sort the party injured is bound to make immediate application to the court in the first instance, and cannot permit money to be expended by a person, even though he has notice of the covenant, and then apply for an injunction."

With regard to the complainant Schneider and his right to enforce against the defendant, Headley, the restrictions in question, three grounds of objection are submitted. First, it is claimed that there is no express contractual relation whereby the defendant, Headley, had agreed with the complainant Schneider to observe the restrictions in question. It should be noted that the deed from the association, conveying lot No. 441 to Wood, was made on March 14th, 1881, while the deed made by the association to Shaw, conveying lot No. 443, was made November 6th, 1880. The rule allowing a purchaser of a lot of land benefited by the covenant to enforce it, though he may not be a direct party to it, is only applicable when a *subsequent* purchaser seeks to enforce it against a *prior* purchaser who made it and against his assigns who took with notice of it. The purchaser who bought subsequently to the covenant, took his lot in expectation of the benefit to be derived from the restrictions imposed by the

prior deed, and is presumed to have adjusted his consideration-money in view of the benefits to his lot which were derived from the observance by the prior purchaser of the restrictions imposed. The prior purchaser did not buy in expectation of any benefit to be derived from him from any subsequent covenant not yet in existence, nor did the subsequent purchaser make his covenant with the common grantor with relation to lands which the latter had previously conveyed and in which he had no interest. It is only when there is a general plan imposed upon the lands sold, under which each purchaser buys, that a prior purchaser may enforce against a subsequent purchaser who violates it. *Mulligan* v. *Jordan, 5 Dick. Ch. Rep. 363; Roberts* v. *Scull, 13 Dick. Ch. Rep. 401.*

In this case the allegations of the bill, as above stated, clearly indicate that there was a general plan of development of the association's lots, of which both complainant Schneider and defendant's (Headley) lots were a part. Although the introduction of proof that there was a general plan, including the reservation of a park as part of it, was resisted by the complainants, the evidence afforded by an inspection of the deeds made by the association to Shaw and to Wood, and the recitals of special restrictions and the object of them all, sufficiently prove that the Ocean City Association, in plotting and selling its lots, was so doing pursuant to a general scheme, to which all sales and conveyances of land were made subject. These deeds are referred to in the complainants' bill and were offered and admitted in evidence, and if this first objection to the *status* of the complainant Schneider were the only one, he should be held to have shown a right to maintain this suit to enforce the covenant in question—part of the general plan.

The second objection taken to Mr. Schneider as complainant is that, knowing that Headley had bought and was about improving his lot in such a manner that his building was located nearer than four feet of the side line, Mr. Schneider stood by and took no efficient step to enforce the restrictions until Mr. Headley had not only begun, but had partially constructed, the foundation of his house; that Mr. Schneider purposely allowed Mr. Headley to build his wall in the objectionable place to a height of some feet,

intending, by obtaining an injunction, to compel him to take it down. The weight of the testimony sustains this criticism of the action of Mr. Schneider. He resided next door to Mr. Headley's lot. The latter's proposed improvement was directly within his observation. He had conversations with Mr. Headley, which show that the proposed location of the latter's house was within Mr. Schneider's consideration and notice.

Mr. Schneider was asked, by his own counsel, relative to Mr. Headley's building:

"*Q.* What had he done at the time you served the first notice on him by word of mouth?
"*A.* You mean in regard to building?
"*Q.* Yes.
"*A.* He had the foundation laid and I spoke to him about it; I would not like to say what he said.
"*Q.* Never mind that; you said that?
"*A.* And he went right on again.
"*Q.* Now, what had he done at the time you served this written notice?
"*A.* He had the building started and continued.
"*Q.* Did he afterwards stop the building for a time?
"*A.* Yes, sir; and went to Atlantic City, came back and started again.
"*Q.* What is the condition of the building now?
"*A.* It is completed and tenants in it."

From his own testimony it thus appears the complainant Schneider stood by, even before his complaint by word of mouth, until after the foundation of Mr. Headley's house had been laid in breach of the restriction. It was three weeks, less one day, after this, before Schneider gave formal notice to Headley of his purpose to take legal proceedings to enforce the restrictions, and it was a month, less one day, before he actually filed his bill. This is the situation as exhibited by Mr. Schneider's testimony. Mr. Headley produces a witness, Albert Baker, who had, about the time this suit was begun, a conversation with Mr. Schneider regarding the location and construction of Mr. Headley's house. Baker was asked:

"*Q.* What did Mr. Schneider say?
"*A.* He said he would wait till Harry got up about six feet and then he would have an injunction put on him, also he would have the bricks removed in front of his lot."

The strong indications of the testimony are that Mr. Schneider stood by and allowed Mr. Headley to spend his money in his improvement, intending to take him at a disadvantage by this suit. He is within the operation of the rule laid down by Lord Eldon, in the above-cited case of *Roper* v. *Williams:* "It is not sufficient to have given notice of the covenant. In every case of this sort the party injured is bound to make immediate application to the court in the first instance, and cannot permit money to be expended by a person, even though he has notice of the covenant, and then apply for an injunction."

The third and last objection made by the defendant to the *status* of the complainant Schneider is that the same covenant under the general plan which Schneider declares, by his bill, is a restriction upon the use of Headley's lot to compel the latter not to erect any building within four feet of the side lines, is also admittedly obligatory upon Schneider himself not to erect any building within four feet of the side line of his lot. The evidence shows that on each side of his lot the complainant Schneider has himself violated these restrictions. On Headley's side, at the time the bill was filed, the roof of Schneider's two porticos actually projected across the line of Headley's lot, for some six and three-quarters inches, for a length of some ten feet as to one, and for seven and a quarter inches as to the other. Since this suit was brought these overprojections have been cut off, but at this time, by Schneider's own testimony, it is admitted that his porches are located within an inch of Headley's property line. The evidence further shows that his whole house, on Headley's side, is within four feet of Headley's line. In this undenied condition of the proofs, showing that the complainant Schneider is presently violating the very covenant which he seeks to enforce, he is in no position to ask the aid of this court to compel another party to observe it. He who seeks equity must do equity. In cases such as are exhibited by these proofs this court will refuse its aid, and the complainants must seek their remedy, if any they have, in the courts of law. *Roberts* v. *Scull, 13 Dick. Ch. Rep. 405.*